1-99-2487

SECOND DIVISION

January 29, 2002

No. 1-99-2487

PPG INDUSTRIES, INC.,

Plaintiff-Appellant/

Cross-Appellee,

v.

THE DEPARTMENT OF REVENUE,

Defendant-Appellee/

Cross-Appellant.

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County 

 

No. 97 L 50872 

Honorable 

Joanne L. Lanigan,

Judge Presiding.

JUSTICE McBRIDE delivered the opinion of the court:

This appeal arises from an administrative review action filed by plaintiff-appellant/cross-appellee, PPG Industries, Inc. (PPG or Taxpayer).  Taxpayer is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  Defendant-appellee/cross-appellant is the Department of Revenue of the State of Illinois (Department).  Taxpayer appeals the trial court's decision which upheld the Department's finding that Taxpayer was liable for tax penalties for the tax years 1987, 1988, 1989, and 1990.  PPG timely filed a notice of appeal on July 12, 1999, seeking only a reversal of the trial court's imposition of penalties based upon the claim that it exercised ordinary business care in determining, filing, and paying its proper tax liability.  On July 22, 1999, the Department cross-appealed the trial court's order which held that the Department's decision concerning throwback or reversionary sales was against the manifest weight of the evidence.

In order to review the propriety of penalties  imposed against PPG, we must determine whether PPG exercised ordinary business care in measuring its tax liability.  To make that determination, we must, in turn, examine five issues: (1) whether PPG and  its subsidiary, PPG Oil and Gas, Inc. (Oil & Gas) were a unitary business group; (2) whether the gain PPG realized from the sale of Oil & Gas's assets was business income apportionable to Illinois; (3) whether royalty income PPG received from intellectual property licensing agreements to foreign entities was business income apportionable to Illinois; (4) whether the Department improperly threw back the sales of certain PPG subsidiaries to Illinois; and (5) whether penalties imposed on PPG for underpaying taxes for the 1987, 1988, 1989, and 1990 tax years under section 1005(a) of the Illinois Income Tax Act  (Ill. Rev.  Stat. 1991, ch. 120, par. 10-1005 (the Act).  were properly calculated. 
(footnote: 1)  We review only those facts necessary for disposing of this appeal.  

PPG is a global manufacturer and distributor of glass, fiberglass, coatings, and resins of chemicals.  It is responsible for paying taxes on a calender year basis.  The Department made two separate audits on PPG for the periods 1987-88 and 1989-90 respectively.  Based on these audits, the Department issued  notices of deficiency against PPG for tax infractions occurring between 1987 and 1990.  PPG timely protested the deficiency notices.  The notices of deficiency and corresponding protests were consolidated for an administrative hearing.  On May 23, 1997, the Department determined that Taxpayer owed an additional tax amount of $1,406,103 plus penalties in the amount of $785,011.11.   

Oil & Gas as Part of PPG's Unitary Business Income

One of PPG's enterprises is the production of potash, which is a potassium carbonate substance derived from the ashes of wood.  While exploring for potash in Michigan, PPG discovered deposits of oil and natural gas.  Based on this discovery, PPG formed  Oil & Gas to maintain the exploration and extraction of oil and natural gas in Michigan.  In 1981, Oil & Gas was incorporated as a wholly owned subsidiary of PPG.  All of the officers of Oil & Gas were officers or employees of PPG.  Thomas Neider, a PPG employee, was the manager of PPG's agricultural and performance chemical division between 1981 and 1987.  Neider was paid by PPG and oversaw potash production as well as the operation of Oil & Gas.

Neider was the supervisor of James Hafenbrack, who was hired by PPG from the Exxon Corporation to be general manager of Oil & Gas.  The record discloses that Hafenbrack was a PPG employee, not an Oil & Gas employee.  Regardless, he was charged with making day-to-day decisions concerning the operations of Oil & Gas such as where wells would be drilled and where lease and land rights could be acquired.

The record also reveals that PPG internally  reported Oil & Gas financial information with the financial reports of its chemical division.   Also, PPG provided all of the operating funds for Oil & Gas.  In 1987, all expenses of Oil & Gas were paid by PPG and then billed to Oil & Gas through PPG's interoffice billing procedure.  Many of the invoices regarding purchases made by Oil & Gas are in PPG's name.  

The record indicates that PPG performed accounting, legal, and tax services for Oil & Gas.  Further, PPG entered into all contracts to sell the products produced by Oil & Gas.  Also, in 1994, the Stony Point natural gas plant was constructed by Oil & Gas in Michigan.  The record indicates that PPG invested a significant amount in the financing and construction of the Stony Point refinery.  

In 1987, all of the assets of Oil & Gas were sold to Marathon Oil Company.  PPG planned, negotiated, and executed the contract to sell Oil & Gas.  Throughout the years when Oil & Gas operated, PPG reported in its annual reports that oil and gas production was part of its chemical processing business.

Gain on the Sale of Oil & Gas Assets

In its 1987 Illinois tax return, PPG excluded Oil & Gas from its unitary business income, and thus excluded the gain on the sale of Oil & Gas' assets to Marathon Oil Company.  Based on the 1987-88 audit, the Department included the gain on the sale of Oil & Gas' assets as part of PPG's unitary business income.  In addition, the Department imposed penalties on PPG for not reporting the gain as Illinois business income.   

[Non-publishable material under Supreme Court Rule 23 omitted here.]

Audit of Throwback Sales

During the two audit periods, James Zamboldi, PPG's supervisor of state income taxes, was the contact person with the auditors.  During these audits, the record reveals that the auditors made written inquiries to PPG to provide data showing sales by origin and destination.  Zamboldi informed the auditors that PPG did not generate documents which indicated sales by origin.  He further said that the only way PPG could comply with the request was through original  invoices, which were maintained on microfiche at PPG's headquarters in Pittsburgh, Pennsylvania, and at other sites throughout the country.

Zamboldi said that neither auditor asked him to generate the invoices from the microfiche.  Also, Zamboldi did not tender any invoices to the auditors.  George Getty, PPG's tax attorney, testified that PPG maintained records that would reflect sales made by destination.  Getty also stated that these documents existed during the audit period and that Zamboldi could have obtained them.

Because the auditors could not acquire the origin and destination sales information they sought, the Department calculated PPG's throwback sales attributable to Illinois by using a formula.  The formula's ratio was based on PPG's average Illinois inventory to PPG's average inventory "everywhere" (or worldwide) and was applied against total sales everywhere (or worldwide).

On May 23, 1997, the Department affirmed the notices of deficiency against PPG.  Specifically, it found, for the audit periods at issue: (1) that PPG and Oil & Gas were a unitary business group; (2) that the gain PPG realized from the sale of Oil & Gas was business income apportionable to Illinois; (3) that royalty income PPG received from intellectual property licensing agreements to foreign entities was business income apportionable to Illinois; (4) that the Department properly threw back the sales of certain PPG subsidiaries to Illinois; and (5) that PPG was liable for penalties for underpaying taxes for the 1987, 1988, 1989, and 1990 tax years.  

As noted above, on August 12, 1997, PPG sought administrative review in the trial court.  The trial court affirmed all of the Department's findings except on the question of reversionary or throwback sales.  In regard to throwback sales, the trial court concluded that the auditors had ignored the sales invoices which, in fact, existed and therefore had not conducted a minimally reasonable audit.  Since the method of calculation lacked accuracy, the trial court held that the Department's assessment of throwback sales was against the manifest weight of the evidence.  Thus, the trial court entered a judgment against PPG in the amount of $3,379,720 which included $785,011 in penalties.  As also stated above, PPG appealed on July 12, 1999, seeking only a  reversal of the trial court's imposition of penalties.  In response, the Department cross-appealed the trial court's order which reversed the Department's decision on the question of throwback sales.

We apply a manifest weight of the evidence standard of review to the first, second, and third questions on appeal.  "The existence of reasonable cause justifying abatement of a [tax] penalty is a factual determination that will be decided only on a case-by-case basis. [Citation.]"  
Kroger Co. v. Department of Revenue
, 284 Ill. App. 3d 473, 484, 673 N.E.2d 710 (1996).  Where the questions to be decided are factual questions, our supreme court has stated that:"[O]n administrative review, it is not a court's function to reweigh the evidence or make an independent determination of the facts.  Rather, the court's function is to ascertain whether the findings and decision of the agency are against the manifest weight of the evidence. [Citations.]  An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident."  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111 (1992).    

With the appropriate standard in place, we examine the arguments made by the parties concerning the first three questions on appeal.

Taxpayer's argument on the first question is that, under the law at the time the audit was conducted, it had reasonable cause to exclude Oil & Gas from its unitary business group.  When Taxpayer filed its tax returns for the years 1987 through 1990, section 1005(a) of the Act provided:

"If any amount of tax required to be shown on a return prescribed by this Act is not paid on or before the date required for filing such return (determined without regard to any extension of time to file), a penalty shall be imposed at the rate of 6% per annum upon the tax underpayment unless it is shown that such failure is due to reasonable cause.  This penalty shall be in addition to any other penalty determined under this Act."  Ill. Rev. Stat. 1991, ch. 120, par. 10-1005. 

The trial judge noted that "reasonable cause," stated above, was not defined in the Act at the time Taxpayer filed its returns for the audit period at issue.  We determine, however, that at least one appellate decision existed at the time Taxpayer's returns were due where reasonable cause was  interpreted to mean the exercise of ordinary care and business prudence.  
Du Mont Ventilation Co. v. Department of Revenue
, 99 Ill. App. 3d 263, 266, 425 N.E.2d 606 (1981), cited in, 
Kroger Co., v. Department of Revenue
, 284 Ill. App. 3d 473, 484, 673 N.E.2d 710 (1996).  

Section 1005 (a) was amended, effective January 1, 1993, omitting the "reasonable cause" language and referring to the Uniform Penalty and Interest Act  (35 ILCS 735/3-1 
et
 
seq
. (West 1994)), which currently contains such language.  35 ILCS 735/3-8 (West 1994).  Regulation section 700.400 (c) of the Illinois Administrative Code, which was adopted under the Uniform Penalty and Interest Act and became effective January 13, 1994, provides the following:

"A taxpayer will be considered to have made good faith effort to determine and file and pay his proper tax liability if he exercised ordinary business care and prudence in doing so.  A determination of whether a taxpayer exercised ordinary business care and prudence is dependent upon the clarity of the law or its interpretation and the taxpayer's experience, knowledge and education."  86 Ill. Adm. Code §700.400(c) (1998).

Further, this court has held that "[r]easonable cause generally has been interpreted to mean the exercise of ordinary business care. [Citation.]"  
Kroger
, 284 Ill. App 3d at 484, 673 N.E.2d 710 (1996);  
Peoria & Pekin Union Ry. Co. v. Department of Revenue
, 301 Ill. App. 3d 736, 744, 704 N.E.2d 884 (1998), 
appeal
 
denied
, 184 Ill. 2d 573, 714 N.E.2d 532 (1998). 

Taxpayer maintains that it was reasonable for it to determine that Oil & Gas was not part of its unitary business group filing in Illinois.  As Taxpayer correctly noted in its brief, the Act defines unitary business group as:

"[A] group of persons related through common ownership whose business activities are integrated with, dependent upon and contribute to each other.

Unitary business activity can ordinarily be illustrated where the activities of the members are: (1) in the same general line (such a manufacturing, wholesaling, retailing of tangible personal property, insurance, transportation or finance); or (2) are steps in a vertically structured enterprise or process (such as the steps involved in the production of natural resources, which might include exploration, mining, refining, and marketing); and, in either instance, the members are functionally integrated through the exercise of strong centralized management (where, for example, authority over such matters as purchasing, finance, tax compliance, product line, personnel, marketing and capital investment is not left to each member)."  35 ILCS 5/1501(a)(27) (West 1994).

Taxpayer, in its brief, also correctly recognized that Illinois courts have defined unitary business group as follows:

"The term 'unitary business group' is used to describe 'a group of functionally integrated corporate units which are so interrelated and interdependent that it becomes relatively impossible for one State to determine the net income generated by a particular corporation's activities within the State and therefore allocable to that State for purposes of taxation.' [Citation.]  The existence of a unitary business group is strongly indicated when a single entity carries on an integrated business in several jurisdictions, with each operation contributing income to the others through centralized management, accumulated know-how and economies of scale. [Citation.]"  
Filtertek, Inc. v. Department of Revenue
, 186 Ill. App. 3d 208, 213, 541 N.E.2d 1385 (1989), 
appeal
 
denied
, 128 Ill. 2d 662, 548 N.E.2d 1068 (1989). 

Citizens Utilities Co. of Illinois v. Department of Revenue
, 111 Ill. 2d 32, 47-48, 488 N.E.2d 984 (1986).   
In addition to Illinois authority, Taxpayer also cites a United States. Supreme Court decision which states:

"The 'linchpin of apportionability' for state income taxation of an interstate enterprise is the 'unitary business principle.' [Citation.]  If a company is a unitary business, then a State may apply an apportionment formula to the taxpayer's total income in order to obtain a 'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State.' [Citations.]  In order to exclude certain income from the apportionment formula, the company must prove that 'the income was earned in the course of activities unrelated to the sale of petroleum products in that State.' [Citation.] The court looks to the 'underlying economic realities of a unitary business,' and the income must derive from 'unrelated business activity' which constitutes a 'discrete business enterprise.' [Citation.]" 
Exxon Corp. v. Wisconsin Department of Revenue
, 447 U.S. 207, 223-24 65 L. Ed. 66, 81, 100 S. Ct. 2109, 2120 (1980). 

Taxpayer further relies on examples set forth in the Illinois Administrative Code which illustrate scenarios where companies are deemed engaged or not engaged in a unitary business activity.  In example D, "corporation K" was involved in the manufacture and sale of canned goods.  corporation K acquired subsidiary corporations L, M, and N, where each manufactured and sold different product lines.  However, corporation K performed centralized warehousing, accounting functions, and inventory control for itself and the three subsidiaries.  Because of the control exerted by corporation K over the subsidiaries, example D concluded that all the companies were engaged in a unitary business activity.  86 Ill. Adm. Code §100.3010(c)(4)(D) (1998).

In example E, however, the Code states the following:

"Same facts as in Example D, except that, although corporation K's board of directors and executive officers maintained overall management control of all the acquired corporations with regard to major policy matters such as personnel and capital expenditures, there was insufficient integration because of the absence of such centralized operations as warehousing, purchasing inventory control or marketing strategy.  Consequently, due to the absence of strong centralized management, the corporations were not engaged in the conduct of unitary business."  86 Ill. Adm. Code §100.3010(c)(4)(E) (1998).

Taxpayer argues that example E is identical to the relationship between PPG and Oil & Gas in this case.

We disagree and conclude that the Department correctly determined that PPG and Oil & Gas were engaged in a unitary business activity as defined by the Act, Illinois Administrative Code, and pertinent case
 
law.  As recognized by both parties and as noted above, the Act sets forth criteria for illustrating unitary business activity: 

"[W]here the activities of the members are: (1) in the same general line  (such as manufacturing, wholesaling, retailing of tangible personal property, insurance transportation or finance); or (2) the members are steps in a vertically integrated enterprise or process (such as the steps involved in the production of natural resources, which might include exploration, mining, refining and marketing); and, in either instance the members are functionally integrated through the exercise of strong, centralized  management  (where, for example, Authority over such matters as purchasing, financing, tax compliance, product line, personnel, marketing and capital investment is not left to each member.)"  35 ILCS 5/1501(a)(27) (West 1994)  (formerly  Ill. Rev. Stat. 1991, ch. 120, par. 15-1501 (a)(27)).

In its brief, Taxpayer contends that PPG and Oil & Gas were not unitary because the parent and subsidiary were not in the same general line of business, were not steps in a vertically structured enterprise, and were not tied together by strong centralized management.  In our view however, Taxpayer offers few facts as evidence that PPG and Oil & Gas were not a unitary business activity.  Rather, the record reveals the opposite conclusion.  

It is undisputed that one of PPG's general lines of business is the sale of chemicals.  When PPG discovered oil in Michigan, it incorporated Oil & Gas, which was brought under the supervision of PPG's chemical division.  It is also undisputed that Oil & Gas was an outgrowth of PPG's potash operations, which were part of PPG's chemical division.  We agree with the Department, which concluded that, although PPG may view its oil and gas operations as a part of a different product line than the other chemicals it sold, the operations of Oil & Gas were in the same general line as PPG's chemical division.  Specifically, the business of manufacturing and selling chemicals.  Further, the record also supports vertical integration of PPG and Oil & Gas through PPG's strong centralized control over Oil & Gas.  The record demonstrates that all of the directors of Oil & Gas were officers or employees of PPG.  Further, Hafenbrack, the principal person in charge of Oil & Gas' daily operations was a contract employee for PPG.  PPG paid the salaries of those employed by Oil & Gas.  Further, accounting, legal, and tax services were provided to Oil & Gas by PPG.  In its annual reports, PPG referred to oil and gas operations as part of its chemical division.  Also, PPG executed all contracts for the sale of Oil & Gas products in Michigan.  Finally, when Taxpayer decided to sell Oil & Gas, PPG approved and executed the contract.  Based on these facts, we conclude that sufficient evidence exists in the record to support the Department's finding that PPG and Oil & Gas were a unitary business activity under the Act.  

Section 1501 (a)(27), cited above, is clear in defining what constitutes a unitary business activity under Illinois law.  35 ILCS 5/1501(a)(27) (West 1994) ( formerly, Ill. Rev. Stat. 1991, ch. 120, par. 15-1501 (a)(27)). The existence of numerous facts which form a basis for concluding that PPG and Oil & Gas were in the same general line of business and that they were a vertically integrated enterprise indicates that PPG did not exercise ordinary business care when it unilaterally determined that no unitary business group existed between the two entities.  Therefore, we find that PPG did not have reasonable cause to conclude that PPG and Oil & Gas failed to meet the criteria for a unitary business activity under the Act.  We thus affirm the imposition of penalties on this question.

We turn to the second question, which is whether the Department's determination that the gain PPG realized from the sale of Oil & Gas was business income apportionable to Illinois.  On its 1987 tax return, PPG excluded Oil & Gas from its unitary business group and, as a result, excluded the gain on the sale of assets of Oil & Gas to Marathon.  The auditors, however, included the gain on the sale of Oil & Gas' assets in PPG's unitary business income.  The Act defines business income, in relevant part, as:

"The term 'business income' means income arising from transaction and activity in the regular course of the taxpayer's trade or business, net of the deductions allocable thereto, and includes income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.   Such term does not include compensation or the deductions allocable thereto."  35 ILCS 5/1501(a)(1) (West 1994) (formerly) Ill. Rev. Stat. 1991, ch. 120, par. 15-1501 (a)(1)).

The Act defines nonbusiness income as "all income other than business income or compensation."  35 ILCS 5/1501(a)(13) (West 1994), formerly, Ill. Rev. Stat. 1991, ch. 120, par. 15-1501 (a)(13).

The principal Illinois cases on this question are 
National Realty & Investment Co. v. Department of Revenue
, 144  Ill. App. 3d 541, 553-54, 494 N.E.2d 924 (1986),  
Kroger
, 284 Ill. App. 3d at 480, and 
Texaco-Cities Service Pipeline Co. v. McGaw
, 182 Ill. 2d 262, 695 N.E.2d 481 (1998).  In 
National Realty
, the court noted that it is the taxpayer's burden to show that the gain in question was nonbusiness income.  Further, the court established two applicable tests for determining whether a gain was business income under section 1501(a)(1) of the Act.  In 
Kroger
, this court reinforced the decision in 
National Realty
 by holding that the two tests established in that case are appropriate for determining business income.   
Kroger
, 284 Ill. App. 3d at 480.

The first test is the transactional test, where "income is classified as business income if it is attributable to a type of business transaction in which taxpayer regularly engages. [Citation.]"  
National Realty
, 144 Ill. App. 3d at 554.  The second test is the functional test, where "all gain from the disposition of property is considered business income  if the property disposed of was used by the taxpayer in its regular trade or business operations.  [Citation.]  If either test is met, the income is business income."  
National Realty
, 144 Ill. App. 3d at 554. 

PPG claims that, because Oil & Gas was not part of PPG's unitary business group, it was reasonable for it to apply the transactional test to the gain realized from the sale of Oil & Gas.  In support of its argument, PPG cites the circuit court's decision in 
Kroger Co. v. Department of Revenue
,which determined that only the transactional test was the law in Illinois during the relevant audit period.  Further, PPG claims that the adoption of the functional test in addition to the transactional test in 
National Realty
 was merely 
dicta
 because the parties in that case stipulated that the two tests existed in law.   We disagree with PPG's interpretation of 
Kroger
 and 
National Realty
.  First, in 
Kroger
, this court rejected the trial court's reasoning on appeal and concluded that both the transactional and functional approach existed for determining business income under section 1501(a)(1) of the Act.  
Kroger
, 284 Ill. App. 3d at 480.  Second, this court also held in 
Kroger
 that "
National Realty
's discussion of the functional test *** was not 
obiter
 
dictum
 because the court there held that the gain was taxable as business income by finding that both tests were sufficiently met."  
Kroger
, 284 Ill. App. 3d at 480.  Further, our supreme court, relying in part on the reasoning established in 
Kroger
, has recently upheld the applicability of the functional test in 
Texaco-Cities
.  
Texaco-Cities Service Pipeline Co.
, 182 Ill. 2d at 273.  We reject PPG's contention that the status of the law at the time supported the exclusive application of the transactional test and conclude that 
National Realty
 was the controlling law to be applied during the relevant audit period.  

In addition to the decision in 
National Realty
, we note that the Department's own regulations required application of the functional test during the tax years 1987, 1988, 1989, and 1990.  "Gain or loss from the sale, exchange or other disposition of real or tangible personal property constitutes business income if the property, while owned by the person, was used in its trade or business." 86 Ill. Adm. Code §100.3050(d)(3) (1985) (now  86 Ill. Adm. Code §100.3010 (d)(3) (2000)).  The above language is virtually identical to the functional test set forth in 
National Realty
.  
National Realty
, 144 Ill. App. 3d at 554.   As a result, we further determine that, during the relevant audit period, both the transactional and functional tests were applicable for purposes of determining business income under the Act.     

Disregarding the functional test established in 
National Realty
 and the Illinois Administrative Code, PPG elected to follow  the transactional test exclusively.  Under that test, PPG claims that it was appropriate to conclude that the sale of Oil & Gas was not a transaction that occurred in the regular course of its business.  According to PPG, the sale of Oil & Gas's assets was an extraordinary event because the discovery of oil that led to the formation of Oil & Gas was so unique in PPG's history that the sale of the assets of Oil & Gas could not be considered within its regular course of business.  Therefore, PPG asserts that it was reasonable to conclude that the sale of Oil & Gas was not a transaction within the regular course of business and, thus, it was appropriate to exclude this gain from its 1987 Illinois income tax return.

The Department asserts that it properly apportioned the gain on the sale of Oil & Gas's assets as part of PPG's Illinois business income and that it correctly imposed penalties on Taxpayer for failing to use reasonable cause in deciding not to report the gain.  The Department also contends that Taxpayer failed to meet its burden by showing that the gain was nonbusiness income under the holding in 
National Realty
.  We agree.

As pointed out by the Department, its own rules, available during the audit period at issue, set forth an example for companies to follow for the purpose of determining business versus nonbusiness income.  The example states, in relevant part, "[a] corporation constructed a plant for its use in its multistate manufacturing business and 20 years later sold the property at a gain while it was in operation by the corporation.  The gain is business income."  We agree with the Department that the above example is analogous to the facts in this case.  

The record reveals that, upon the discovery of petroleum in Michigan, PPG incorporated Oil & Gas and its processing plant to further the exploration, extraction, and refinement of oil and natural gas.  The record also discloses that PPG sold Oil & Gas at a gain while it was in operation by PPG.  Based on the law available to Taxpayer during the relevant period, we conclude that  Taxpayer did not have reasonable cause to determine that the gain realized from the sale of Oil & Gas was not business income as defined under section 1501(a)(1) of the Act.  By  failing to even apply the functional test, Taxpayer failed to meet its burden of demonstrating that the gain was nonbusiness income.  We note that, in the event the functional test were to be applied, PPG's argument that the sale of Oil & Gas was an extraordinary event would fail.  "Under the functional test, *** the extraordinary nature or infrequency of the sale is irrelevant."   
Texaco-Cities Service Pipeline Co.
, 182 Ill. 2d at 269. 

In addition, in the event the transactional approach were to be applied, evidence in the record supports the Department's conclusion that part of PPG's regular business activity was the buying and selling of other businesses.  Specifically, a review of PPG's 1987 annual report indicates that PPG acquired several businesses in that year alone and further verifies the selling of several businesses as part of PPG's strategic and performance objectives.

As recognized by the Department, the Illinois Administrative Code  provides that, "[i]n general, all transactions and activity which are dependent upon or contribute to the operations of the economic enterprise as a whole will be transactions and activity arising in the regular course of trade or business."  86 Ill. Adm. Code §100.3050(a) (1985) (now 86 Ill. Adm. Code §100.3010 (a) (2000)).

We conclude that PPG was engaged in the acquisition and divestiture of other companies in the regular course of its business and that the sale of Oil & Gas's assets was attributable to a type of business transaction in which the Taxpayer routinely engaged.  Therefore, we determine that PPG failed to demonstrate that the gain realized from the sale of the assets of Oil & Gas was non-business income under the functional or transactional tests set forth in section 1501(a) of the Act. 

The applicable statutes and case law were sufficiently clear concerning the application of both the functional and transactional tests for the purpose of determining nonbusiness income.  We conclude, therefore, that the Department's classification of the gain as business  income was not against the manifest weight of the evidence and that PPG did not have reasonable cause to categorize the gain in question as non-business income.  We therefore affirm the imposition of penalties on the sale of Oil & Gas as business income.

[Non-publishable material under Supreme Court Rule 23 omitted here.]

We turn to the fourth question, which is the subject of the Department's cross-appeal.  That question is whether the Department properly taxed and penalized Taxpayer for PPG's reversionary or "throwback" sales emanating from Illinois during the audit period.  As a preliminary matter, we apply a clearly erroneous standard of review to this question.  Where a case involves an examination of the legal effect of a given set of facts, a mixed question of fact and law is presented and a clearly erroneous standard is used by the court on review.   
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205, 692 N.E.2d 295 (1998). 

" 'Clearly erroneous' is said to rest somewhere between the 'manifest weight of the evidence,' and 
de novo
, requiring us to afford some deference to the agency's experience and expertise. [Citations.]  Under this standard, we must accept the administrative agency's findings unless we are firmly convinced the agency has made a mistake.  [Citation.]"   
Randolph Street Gallery v. Zehnder
,  315 Ill. App. 3d 1060, 1064, 735 N.E.2d 100 (2000). 

Because we must determine the legal effect of the reversionary sales statute within the context of a certain set of facts, we determine that our standard of review is clearly erroneous on the fourth question. 

As correctly noted by Taxpayer, the basis of the "throwback rule" for reversionary sales is found in section 304 (a)(3)(B) of the Act which provides, in relevant part, that sales of tangible personal property are subject to taxation in Illinois if the property is shipped from Illinois and the purchaser is not taxable in the purchaser's state.  35 ILCS 5/304 (a)(3)(B)(ii) (West 1998) (formerly Ill. Rev. Stat. 1991, ch.120, par. 3-304 (a)(3)(B)).  In other words, section 3-304 (a)(3)(B)(ii) provides that, "sales of tangible personal property that occur in states where the [Taxpayer] is not taxable are deemed to be sales 'in this State' and thus apportioned to Illinois [as business income]. [Citation.]"  
Hartmarx Corp. & Subsidiaries v. Bower
, 309 Ill. App. 3d 959, 965, 723 N.E.2d 820 (1999), 
appeal
 
denied
, 188 Ill. 2d 564, 729 N.E.2d 496 (1999).  Thus, the auditors in this case attempted to determine if PPG's property was shipped from an Illinois location and if a sale was made to a purchaser in a state where PPG was not subject to taxation. 

In order to make such a determination, the auditors requested throwback sales data from PPG which reflected the origin and destination of PPG's sales.  As noted above, a calculation of throwback sales requires both a determination of where sales were shipped and where they were destined.  Zamboldi testified that the auditors did request origin and destination sales documents from PPG.  He further stated that PPG did not keep sales records by origin and that the only way PPG could provide that information was by examining the invoice for each sale.  These sales invoices, according to Zamboldi, were "voluminous" in nature and were kept on microfiche.  He also testified that he offered to make the invoices available for the auditors' inspection and that the invoices were located at PPG's office in Pittsburgh.  The record reveals that PPG made no effort to compile or tender the invoices to the auditors in response to the document request.

As a result, the auditors made throwback sales calculations based on a formula without reviewing the invoices indicating origin of sales.  One of the two auditors testified that the formula was based on a percentage that was computed by comparing Illinois inventory with PPG's inventory everywhere (or worldwide).  The formula was applied to certain sales figures in Alaska, Hawaii and certain foreign countries where the auditors believed reversionary sales apportionable to Illinois existed.  Further, the auditor testified that the application of the formula could result in reversionary sales where, in fact, none had been made by the Taxpayer.  Nonetheless, a formula was implemented as the method of calculation and a tax liability for reversionary sales was imposed on Taxpayer.

At the administrative hearing, Getty, PPG's tax counsel, testified that, during the audit period, PPG maintained, and that he had reviewed,  records which would reflect PPG's sales made by destination.  He further said that PPG collects destination sales from every possible source within the company for those states whose law requires apportionment by destination sales.  In addition, Getty stated that destination sales documentation would have been available to Zamboldi during the audit period.  Getty also testified that destination sales records indicating that PPG did not make sales out of Illinois to the State of Alaska would not have been tendered to the auditors.  At the hearing, PPG did not tender any documentation indicating an accurate calculation of sales from Illinois into Alaska, Hawaii, or any foreign country.  The Department upheld the auditor's computation of throwback sales.  
 PPG claims that the Department improperly imposed throwback penalties because it never established a 
prima
 
facie
 case that the formula, applied in lieu of actual PPG sales originating in Illinois and ending in Alaska, Hawaii, or a foreign country, represented the appropriate amount of tax due as required under Illinois law.  PPG further claims that, for whatever reason, the auditors elected not to review the invoice records maintained on microfiche but instead chose to utilize the formula to calculate hypothetical sales from Illinois to Alaska, Hawaii, and foreign locations.  According to PPG, this is not a case where Taxpayer refused to provide the requested records.  Rather, PPG submits that the auditors chose to ignore the original sales invoices, which were located in the Pittsburgh office building.  Further, PPG  contends that access to the invoices was made available to the auditors as evidenced by the testimony of Zamboldi above.  Because the invoices were kept on microfiche, tendering the documents to the auditors by hand was impossible according to PPG.  The auditors, from PPG's standpoint, needed only to accept the offer to examine the invoices which would have allowed a review of the information requested.

PPG claims that, "[w]here a taxpayer has made records available to the Department, and the Department has refused to review those records, but instead has used an arbitrary formula method to calculate a tax, then that method is unreasonable."  In support of this proposition, PPG relies on 
Fillichio v. Department of Revenue
, 15 Ill. 2d 327, 335, 155 N.E.2d 3 (1958), and 
Goldfarb v. Department of Revenue
, 411 Ill. 573, 580, 104 N.E.2d 606 (1952).  In 
Fillichio
, the court found that, under the Retailers' Occupation Tax Act (now see 35 ILCS 120/1 
et seq
. (West 1994)), the Department's correction of taxpayer's tax returns 

"is deemed to be
 prima facie
 correct and 
prima facie
 evidence of the correctness of the amount of tax shown to be due therein. [Citations.] The taxpayer, thus, has the burden of proving by competent evidence that the proposed assessment is not correct, and when such evidence is not so inconsistent or improbable in itself as to be unworthy of belief, the burden then shifts to the Department which is required to prove its case by competent evidence."  
Fillichio
, 15 Ill. 2d at 333.    

Under the facts in 
Fillichio
, the court found that the documents tendered by the taxpayer were so improbable that they were unworthy of belief and, therefore, were insufficient to overcome the 
prima
 
facie
 case put on by the Department.  
Fillichio
, 15 Ill. 2d at 334.  We presume PPG cited this case, not for its facts, but for the principle that the taxpayer, by furnishing competent evidence to the contrary, can shift the burden back on the Department to prove its case by competent evidence.  

In 
Goldfarb
, another Retailers'  Occupation Tax Act case, the court found that the Department ignored records furnished by the taxpayer that were not inconsistent, improbable, or unworthy of belief.  Thus, the court found that the 
prima
 
facie
 case made by the Department was defeated.  
Goldfarb
, 411 Ill. at 578.  PPG further relies on a case decided by this court which held that:

"[Under the Retailers' Occupation Tax Act,] [a] corrected return prepared by the Department is deemed 
prima facie
 correct.  [Citation.]  At the administrative hearing, the Department successfully established a 
prima facie
 case simply by submitting the corrected return into evidence.  [Citation.] If the corrected return is challenged, the Department must show that its method of preparing the return meets some minimum standard of reasonableness.  [Citation.]" 
Central Furniture Mart, Inc. v. Johnson
, 157 Ill. App. 3d 907, 910, 510 N.E.2d 937 (1987), 
appeal
 
denied
, 117 Ill. 2d 542, 517 N.E.2d 1084 (1987).

The trial court in this case relied on the reasonableness principle set forth above when it ruled that  "[t]o simply ignore the records a taxpayer has in its possession without examining them does not constitute a proper audit or investigation, nor a showing [that the Department] has established a prima facie case."  Specifically, the trial court relied on 
Puleo v. Department of Revenue
, 117 Ill. App. 3d 260, 266, 453 N.E.2d 48 (1983), which adhered to the reasonableness principle set forth above.  In this case, the trial court elected to focus on the reasonableness of the Department's audit as opposed to examining the findings of the administrative law judge (ALJ).   

Because the Department did not review the actual sales invoices, PPG concludes that the trial court correctly found that  a reasonable audit was not conducted concerning the alleged reversionary sales made by PPG that were attributable to Illinois.  As such, PPG claims that the imposition of any tax or penalty on PPG based on throwback sales is contrary to the law and that the trial court's decision should be affirmed on this question.

The Department argues that, by properly making corrections on reversionary sales, it has established a 
prima
 
facie
 case and that PPG failed to rebut the presumption by competent evidence.  Under Illinois law, the Department claims that, once the burden is placed on the taxpayer, it has the responsibility to introduce evidence at the hearing to prove the legitimacy of its claim.  
Balla v. Department of Revenue
, 96 Ill. App. 3d 293, 296, 421 N.E.2d 236 (1981).  Further, the Department claims that PPG had the burden of overcoming its 
prima
 
facie
 case through documentary evidence, meaning books and records, and not mere testimony.  
Jefferson Ice Co. v. Johnson
, 139 Ill. App. 3d 626, 632, 487 N.E.2d 1126 (1985);  
Mel-Park Drugs, Inc. v. Department of Revenue
, 218 Ill. App. 3d 203, 217, 577 N.E.2d 1278 (1991); 
A.R. Barnes & Co. v. Department of Revenue
, 173 Ill. App. 3d 826, 832, 527 N.E.2d 1048 (1988);  
Masini v. Department of Revenue
, 60 Ill. App. 3d 11, 15, 376 N.E.2d 324 (1978);  
Copilevitz v. Department of Revenue
, 41 Ill. 2d 154, 157-58, 242 N.E.2d 205 (1968).  Based on these cases, the Department claims that the testimony of Zamboldi and Getty is insufficient to overcome its 
prima
 
facie
 case that the reversionary sales were properly computed based on the formula.  We agree.

First, we conclude that the formula applied by the auditors was proper.  The combined apportionment formula is measured as follows:  

"  '[To] determine the apportionment factor for a [taxpayer] subject to the Illinois income tax, the property, payroll, and sales factors would be computed using the [taxpayer's] Illinois property, payroll, and sales as numerators, and the entire unitary group's property payroll, and sales as denominators.  The average of these three factors would be the [taxpayer's] apportionment factor.  This apportionment factor then would be applied to the group's total business income to derive the amount of business income on which the [taxpayer] would pay Illinois income tax'. [Citation.]"  
Hartmarx Corp.
, 309 Ill. App. 3d at 965.

As noted by the ALJ, the sales factor component of the combined apportionment formula measures the sales made in Illinois versus the sales made everywhere else.  Because the auditors could not obtain PPG records reflecting origin and destination sales pertinent to Illinois, the record reflects that they compared PPG's Illinois inventory with PPG inventory worldwide to determine reversionary sales.  Under Illinois law, the formula employed must not be arbitrary or unreasonable.  
Fillichio
, 15 Ill. 2d at 366.  Because the auditors were not tendered the sales invoices they requested, we find that it was reasonable for them to substitute inventory to determine reversionary sales in Illinois.

Moreover, in its brief, PPG does not affirmatively claim that the formula, itself, was improper.  Rather, it claims that applying the formula was inappropriate as PPG offered the auditors an opportunity to examine its sales invoices.  Thus, we conclude that the formula employed by the auditors was reasonable.

Further, we determine that the Department established a 
prima
 
facie
 case that its reversionary sales calculations were correct.  As noted above, "[a] corrected return as prepared by the Department is *** deemed 
prima
 
facie
 correct."  
Jefferson Ice Co.
, 139 Ill. App. 3d at 630.  Further, the law establishes that, "[t]o overcome the Department's 
prima facie
 case, a taxpayer must present more than its testimony denying the accuracy of the assessments, but must present sufficient documentary support for its assertions."  
Mel-Park Drugs, Inc.
, 218 Ill. App. 3d at 217. 

The record reveals that the auditors requested documents reflecting origin and destination sales by PPG that pertained to  Illinois.
  The record also demonstrates that PPG may have had records from which an accurate count of Illinois sales could have been made.  Specifically, Getty testified that he reviewed printouts which could be used to establish that PPG products were shipped from Illinois to Alaska.  Further, Getty admitted that, during 1987, minimal sales were made from an Illinois location to a location in Hawaii.  
The ALJ found that Getty's determination that minimal sales were made to Hawaii must have been based on some documentation.  However, PPG only offered the testimony of Getty and Zamboldi instead of tendering any of the documents requested.  The record reveals that the ALJ placed significant emphasis on the fact that PPG was not forthcoming in providing the documents requested by the auditors. 

The ALJ determined that PPG distributed monthly financial statements to its chemical division sales managers which included detailed sales information such as net sales figures, domestic sales figures, tolled sales figures, export sales figures, and captive sales figures.  In an interoffice memo, PPG also informed its chemical division managers that detailed sales information by SKU number was available in the "OP&I" (computer) system.  The ALJ found that PPG's data gathering and record-keeping capabilities most likely produced the records Getty reviewed prior to testifying at the hearing before the Department.  He further determined that such a data analysis system could have produced the documentation requested by the auditors. 

When asked by the auditors for the sales by origin records, Zamboldi testified that PPG did not keep such records and that the only way PPG would be able to supply such information is through the original sales invoices, which were voluminous in number and were maintained on microfiche at PPG's Pittsburgh office.  Zamboldi did claim that he made the invoices available for the auditors' inspection.  However, he also stated that he did not prepare or tender any of the sales invoices to the auditors.

We agree with the ALJ's determination that merely making the  sales invoices available to Illinois auditors via microfiche in Pittsburgh is not tendering the requested documents "subject to inspection" as required under the Act.  35 ILCS 5/913 (West 1998) (formerly Ill. Rev. Stat. 1991, ch. 120, par.  9-913)).  The ALJ also determined that PPG's computerized record-keeping system would have contained information PPG included in its original sales invoices.  Because the evidence indicated that PPG maintained a "well-kept" and "automated" record-keeping system, the ALJ gave little weight to the testimony of Getty and Zamboldi that records indicating origin and destination sales were not maintained and could not be produced by PPG.  Giving proper deference to the Department, under our clearly erroneous standard of review, we will not disturb its findings unless we are firmly convinced the agency has made a mistake.      

PPG also contends that the cases relied on by the Department are based on the Retailers' Occupation Tax Act, not the Act, and thus the Department's authority is inapplicable to this case.  Unlike the retailers' occupation tax, PPG claims that there is not a statutorily imposed requirement to maintain books and records under the Act.   We disagree.  This court held in 
Balla
, a case involving the Act, that petitioner's testimony concerning her entitlement to certain tax exemptions was insufficient absent records corroborating her statements.  
Balla
, 96 Ill. App. 3d at 296.  As noted by the Department, the petitioner in 
Balla
 was a single mother who sought review of the Department's decision disallowing income tax exemptions that she claimed for her three minor children.  In affirming the decision of the Department, the trial court relied on Retailers' Occupation Tax Act cases in finding that petitioner had failed to sustain her burden of proof.  This court, concluded: 

"while we do not hold the type of proof required to establish the petitioner's claim must rise to the level of that expected under the Retailers' Occupation Tax Act, we do not believe it is unreasonable to expect her to do more than simply state that she supported the children."  
Balla
, 96 Ill. App. 3d at 296.

The court further concluded that a request that petitioner produce some written documentation in support of her claim was not unreasonable.  
Balla
, 96 Ill. App. 3d at 296-97.  We find the court's decision in 
Balla
 instructive and conclude that PPG, a sophisticated business entity, was obliged to provide written documentation refuting the Department's 
prima
 
facie
 case that taxes based on reversionary sales were owed.  

In addition, PPG did not have reasonable cause to conclude that it was exempt from payment of taxes based on the claim that no reversionary sales emanated from Illinois.  Getty admitted that minimal sales were made to Hawaii.  PPG is subject to taxation for those reversionary sales made to Hawaii, Alaska, or anywhere else.  As noted above, PPG did not enter any documentary evidence supporting the claim that no throwback sales were made.  Rather, it relied solely on the testimony of Zamboldi, who said there were no sales, and Getty, who admitted that minimal reversionary sales were made to Hawaii.  

The ALJ concluded, after hearing all the testimony, that documents existed upon which PPG unilaterally determined that it was not subject to taxation for reversionary sales  that emanated from Illinois.  Instead of introducing these records at the hearing, PPG chose to rely on the testimony of Zamboldi and Getty.  The ALJ further gave little credence to the testimony of these witnesses which concluded that the only records from which PPG's Illinois origination sales could be gleaned were original sales invoices.  Therefore, we reverse the trial court's decision that the Department's audit on reversionary sales was unreasonable. 

Further, under a clearly erroneous standard of review, we must accept the administrative agency's findings unless we are firmly convinced the agency has made a mistake.  
Randolph Street Gallery
, 315 Ill. App. 3d at 1064.  Based on this record, we are not firmly convinced that the agency was mistaken.  
Accordingly, we reverse that portion of the trial court's decision that overturned Department's determination on reversionary sales.
  In addition, we determine that the penalty imposed on PPG by the Department was proper.   

[Non-publishable material  under Supreme Court Rule 23 omitted here.]

For reasons above, we affirm the trial court's order in all respects except as to the reversionary sales.  The Department's decision concerning the reversionary sales is reinstated
.
  
[Non-publishable material under Supreme Court Rule 23 omitted here.]
 

Affirmed.

GORDON and COUSINS, JJ., concur.
 

FOOTNOTES
1: Because of the page limitations imposed under revised Supreme Court Rule 23 (166 Ill. 2d R. 23), we must delete from the published opinion our discussion of the royalty income and tax penalty questions (issues three and five).  A discussion of these issues appears in the full, unabridged order which is on file with the clerk of the court under docket No. 1-99-2487.